[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-11447

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 13, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 01-00126-CV-2-WLS-1

LUCIUS ADKINS
JILL ADKINS,

Plaintiffs-Counter-
Defendants-Appellants,

versus

CAGLE FOODS JV, LLC,
d.b.a. Cagle-Keystone Foods,

Defendant-Counter-
Claimant-Appellee,

CAGLE'S, INC.,
CAGLE'S FARMS, INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(June 13, 2005)**

Before EDMONDSON, Chief Judge, and TJOFLAT and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

This case involves an interpretation of the Packers & Stockyards Act, 7 U.S.C. § 192(a) and (b), which prohibits live poultry dealers from "engag[ing] in or us[ing] any unfair, unjustly discriminatory, or deceptive practice or device," or "mak[ing] or giv[ing] any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject[ing] any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect". The plaintiffs, Lucius and Jill Adkins, are broiler growers under contract with defendant operators of poultry processing facilities. The Adkins claim that the defendants, Cagle's, Inc. ("Cagle's"), Cagle's Farms, Inc. ("Cagle's Farms"), and Cagle Foods JV, LLC ("Cagle JV"), violated federal agricultural statutes, committed state-law fraud and breach of contract, and are liable under other related causes of action.

**I.**

The plaintiffs, Lucius and Jill Adkins, had been engaged in farming for several years when they decided, in late 1990 or early 1991, to grow broiler

chickens in order to diversify their farm income.[1]  Lucius[2] met with Danny Eiland of Cagle's, who provided estimates of typical costs and expenses encountered in the business, derived from industry averages and actual production data on other farms.  The estimates included a disclaimer which provided that the projections were for illustrative purposes only and not intended as a forecast of actual performance.  The Adkins independently verified the validity of the estimates and proceeded to construct four chicken houses in 1991.  The estimates proved reasonably accurate and the operation performed well.  The Adkins constructed two additional houses in 1994, and four more houses on a new farm in 1995.  On each occasion, the Adkins obtained additional estimates from Cagle JV, which by that time was the only one of the defendant entities conducting business with the

---

[1]The various defendants operate an integrated poultry processing business.  They contract some farmers, known as "breeder growers," to raise hens for the express purpose of laying eggs.  These eggs are then hatched at a hatchery.  Soon after the eggs are hatched, the young chicks are sent to a "broiler grower," like the Adkins.  Under the basic terms of a Broiler Production Agreement, the broiler grower supplies the chicken houses and does the farm work necessary to raise the chicks, while the defendants supply feed and medications.  After a predetermined period, the defendants collect the grown chickens from the broiler grower and weigh them.  The broiler growers are paid according to a formula which depends primarily on the weight of the grown birds and the weight of feed used.  The defendants then slaughter the chickens, process the meat, and sell it.

[2]To avoid confusion, and with all due respect, we refer to the Adkins individually throughout this opinion as "Lucius" or "Jill" as appropriate.

Adkins.[3]

By the time of the 1994 house construction, Cagle JV had responded to market pressures by providing its broiler growers with larger birds, which resulted in a reduction in the number of flocks per year from the 1991 estimated figures. Lucius admitted in a deposition that the Adkins did not suffer any damages as a result of the change, and that Cagle JV's actions in making the change were not fraudulent. Furthermore, Lucius believed the new estimates he received before the 1995 construction to be accurate and reasonable.

The relationship between Cagle JV[4] and its growers was memorialized in a series of Broiler Production Agreements, which set forth the obligations of Cagle JV to provide the birds, feed, and medications, and to weigh the birds promptly upon harvest. The agreement also set out the pay schedule for the duration of the contract. No contract ever specified the specific number of birds to be placed in each house or the number of flocks per year. All the contracts contained merger clauses.

In 1996, in reponse to requests from its largest customer, Cagle JV began

---

[3]Cagle JV came into existence in 1993 as a joint venture between Cagle's and another company in order to expand poultry processing facilities in south Georgia. All the Adkins' dealings after October 1993 were with Cagle JV.

[4]Before October 1993, the Broiler Production Agreements were between the Adkins and Cagle's.

placing an even larger bird with its growers. In order to preserve the health of the bird, and for other reasons, Cagle JV decreased the number of birds placed in each house. The Adkins made no complaints at the time. The increase in bird size made up for the lower number of birds. Furthermore, Cagle JV's payment per pound increased from 3.95 cents to 4.8 cents between 1997 and 2004.

In May 1996, the Grain Inspection, Packers and Stockyard Administration (GIPSA) found that up until 1995, Cagle JV had used different tractors to take the loaded weight and the tare weight of chicken trailers. Cagle JV therefore recalculated its prior payments to correct for the discrepancy. Cagle JV reimbursed the Adkins and other farmers who had been underpaid, but did not request refunds from farmers who had been overpaid.

Lucius Adkins joined the United Poultry Growers' Association ("UPGA") in 1997, and became the UPGA president in November 1998. At about the same time that Lucius became involved in the UPGA, the Adkins allege that Cagle JV began sending them poor quality birds to raise on their farms. The Adkins also claim that Cagle JV sometimes sent them poor quality feed for the birds or failed to send sufficient feed. Lucius asserts that employees of Cagle JV repeatedly threatened that he should do as the company told him or the company would "break" him. The Adkins claim that these threats were meant to discourage

5

participation in the UPGA.

In May 1999, Cagle JV presented all its growers a new contract which provided for higher payments in exchange for an agreement to arbitrate disputes arising under the contract. The Adkins rejected this proposal and continued to do business under the old contract.[5]

In June 2001, the Adkins filed the present action in the Middle District of Georgia against Cagle JV, Cagle's, and Cagle's Farms. The complaint brought claims for (1) violation of the Packers and Stockyards Act ("PSA"), (2) fraud, (3) violation of the Georgia RICO statute, (4) fraudulent inducement and promissory estoppel, (5) violation of the Agricultural Fair Practices Act ("AFPA"), and (6) breach of contract. In response, Cagle's, Inc., and Cagle's Farms, Inc. filed a motion for summary judgment arguing, <u>inter alia</u>, that they had not had dealings with the Adkins since 1993 and that the Adkins' claims were therefore time-barred. The district court granted the motion. Cagle JV filed a motion for summary judgment on the merits of the Adkins' claims. The district court granted Cagle JV's motion as well. The Adkins appeal both rulings.

---

[5]In April 2002, after the Adkins commenced this litigation, Cagle offered a different contract. The new contract provided for an arbitration option but included a higher rate for growers regardless.

## II.

A.     Standard of Review

We review the district court's grant of a motion for summary judgment <u>de novo</u>. <u>Hinson v. Clinch County Board of Education</u>, 231 F.3d 821, 826 (11th Cir. 2000). The moving party bears the initial burden of showing that there is an absence of a genuine issue of material fact and that it is therefore entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the non-moving party must show the existence of a genuine issue of material fact that remains to be resolved at trial. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). The non-moving party must set forth specific facts showing that there is a genuine issue for trial, not merely make a summary denial of the movant's allegations. Fed. R. Civ. P. 56(e).

B.     The Adkins' Claims Against Cagle Foods JV

*1. Packers and Stockyards Act Claim*

The PSA prohibits live poultry dealers from "engag[ing] in or us[ing] any unfair, unjustly discriminatory, or deceptive practice or device," or "mak[ing] or giv[ing] any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject[ing] any particular person or locality to

7

any undue or unreasonable prejudice or disadvantage in any respect". 7 U.S.C. § 192(a) and (b). The Adkins have alleged that Cagle JV violated this statute when it (1) provided them with inferior birds, (2) provided them with inferior or insufficient feed, (3) improperly weighed birds they had raised, and (4) offered them an unfair arbitration contract.[6]

There is no evidence that the Adkins received a substantial number of inferior birds, much less that Cagle JV intended to provide them with poor quality birds. The Adkins did demonstrate that Cagle JV could choose to send buses of chicks to different farms once they were loaded, but this falls far short of a showing that Cagle JV discriminated against the Adkins by sending them inferior birds. Uncontroverted evidence states that flocks were only sent to a different farm when the original destination farm was not yet ready to receive them. Chick quality is also a complex matter which cannot be determined at a glance, meaning that it would be difficult to judge the quality of a flock when loaded onto a bus for

---

[6]We do not imply that these factual allegations, if proved, would establish a violation of the PSA. In the present case, it is sufficient for us to hold that the district court was correct in finding that the Adkins did not prove their allegations, and that the few facts they did produce were insufficient to make out a PSA claim.

This court recently held that to prevail under this provision of the Packers and Stockyards Act, a plaintiff must show that the defendant's unfair, unjustly discriminatory, or deceptive trade practice either adversely affects competition or is likely to adversely affect competition. London v. Fieldale Farms Corp., ___ F.3d ___, 2005 WL 1279147, at *7 (11th Cir. 2005). The Adkins have presented no evidence that any of Cagle JV's activities had an adverse effect on competition, or were likely to have such an effect.

8

transport. Nothing in the record suggests that Cagle JV ever delivered poor quality chicks to the Adkins or any other broiler growers with any discriminatory purpose.

Nor have the Adkins produced evidence of specific instances where Cagle JV gave them insufficient or inferior feed. The evidence did suggest that some of Cagle JV's broiler farms would run out of feed from time to time while others received too much. But the Adkins did nothing to show that they were ever specifically targeted for insufficient or inferior feed.

The Adkins have also failed to establish any illegal weighing practices. In the earlier years of the Camilla plant's operation, there were discrepancies in the weighing process that might affect the live weight. Cagle JV made reimbursement payments to cover all misweighings prior to 1995, and the Adkins cannot identify any instances where Cagle JV misweighed their birds after 1995.

Beginning in 1999, Cagle JV offered broiler growers a new form of Broiler Production Agreement which contained an arbitration clause. The Adkins allege that these arbitration contracts were unfair. At first the arbitration contracts were made available to all broiler growers, at their option, with a higher rate of pay for those who accepted them. The contracts were changed later so that all growers received the same pay, with arbitration still at the grower's option. There is

9

nothing unfair or discriminatory about Cagle JV's offer of a higher rate of pay in consideration for arbitration. Furthermore, contrary to the Adkins' assertion, there is no evidence that Cagle JV ever "guaranteed" the Adkins a pay increase which they were later "denied" because of their failure to sign the arbitration contract.

*2. Fraud Claim*

To sustain a fraud claim under Georgia law, the plaintiff must show (1) a false representation made by the defendants; (2) scienter, or knowledge of the statement's falsity at the time it was made; (3) an intention to induce the plaintiff to act or refrain from acting in reliance on the statement; (4) the plaintiff's justifiable reliance; and (5) damage to the plaintiff. Pro-Fab v. Vipa, Inc., 772 F.2d 847, 851 (11th Cir. 1985). The Adkins claim that Cagle JV committed four types of intentional and false acts: (1) recording false trailer weights; (2) recording false tare and gross weights; (3) failing to promptly weigh the Adkins' birds; and (4) providing inferior birds.

In their brief to this court, the Adkins assert that if there is slight, circumstantial evidence supporting a fraud claim, that claim should be tried to a jury. This is a correct statement of Georgia law on the scienter element of fraud, but not on all elements of a fraud claim. Ades v. Werther, 256 Ga. App. 8 (2002); Quill v. Newberry, 238 Ga. App. 184 (1999). Before scienter is reached, the

10

Adkins must identify a false representation.

The Adkins have not identified any false representation. As noted supra, there is no evidence of any intentional misweighing of the Adkins' birds, or of intentional deliveries of poor quality birds or feed to the Adkins. Any discrepancies caused by the improper weighing procedures used before 1995 were corrected by Cagle JV's reimbursement payments. Furthermore, the estimates Danny Eiland originally provided the Adkins contained express disclaimers that they were not to be taken as a guarantee of future performance and therefore cannot be fraudulent misrepresentations, even though the company later decided to change the size of the birds and the number of birds per house.

3. *Georgia RICO Claim*

To prove a violation of the Georgia RICO statute, the Adkins must demonstrate two or more predicate acts which are related and have continuity. Pelletier v. Zweifel, 921 F.2d 1465, 1513 (11th Cir. 1991); O.C.G.A. § 16-14-3(8). The Adkins have attempted to prove federal mail fraud and state-law theft by deception.

To prove a violation of the federal mail fraud statute, the Adkins must show that Cagle JV "(1) intentionally participate[d] in a scheme to defraud another of money or property and (2) use[d] the mails or wires in furtherance of that scheme."

11

Pelletier, 921 F.2d at 1498. To prove theft by deception under Georgia law, the Adkins must demonstrate that Cagle JV had criminal intent and knowledge. Avery v. Chrysler Motors Corp., 214 Ga. App. 602 (1994). The Adkins relied on the same facts for these claims as for their fraud claim. Because we have found that Cagle JV did not make any fraudulent or deceptive communications or have any kind of criminal intent, the Adkins' claim fails. The Adkins also claim that Cagle JV committed mail fraud by mailing fraudulent final statements to them. However, the Adkins have not identified any statement which was allegedly fraudulent.

### 4. Fraudulent Inducement and Promissory Estoppel Claims

Georgia law is clear that "fraud cannot be predicated upon statements which are promissory in their nature as to future acts." Warner v. Jeter, 115 Ga. App. 6, 7 (1967); see also Smith v. McClung, 215 Ga. App. 786, 788 (1994) (holding that "representations concerning expectations and hopes are not actionable"). Georgia courts also have held that, absent something more, a promise that a business could be expected to generate a certain income does not constitute fraud. See Krys v. Henderson, 85 Ga. App. 323, 325 (1952).

The Adkins contend that Cagle JV's initial estimates regarding the future performance of their farms were intentional misrepresentations which can

establish a predicate for fraudulent inducement.  The Adkins' argument fails, however, because of both the rule in <u>Warner</u> and the language included in each estimate disclaiming any representation as to future performance.  Nor is there any evidence in the record that Cagle JV misrepresented anything in its estimates, intentionally or otherwise.

The Adkins also claim that the initial estimates constituted promises which were enforceable by the doctrine of promissory estoppel.  Under Georgia law such an estoppel requires a showing that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiffs would rely on such promises, and (3) the plaintiffs did in fact rely on such promises to their detriment.  <u>Doll v. Grand Union Co.</u>, 925 F.2d 1363 (11th Cir. 1991).  Importantly, where a plaintiff seeks to enforce an underlying contract which is reduced to writing, promissory estoppel is not available as a remedy.  <u>Bank of Dade v. Reeves</u>, 257 Ga. 53 (1987).  Furthermore, promissory estoppel does not apply to representations concerning the future, but to representations of past or present facts.  <u>Voyles v. Sasser</u>, 221 Ga. App. 305, 305-306 (1996).

The series of Broiler Production Agreements between Cagle JV and the Adkins all contained merger clauses; thus, if the estimates were enforceable at all, it must have been as a part of those agreements.  Nothing in the agreements

13

incorporated the initial estimates. Moreover, because the agreements were written they could not be enforced by promissary estoppel. Furthermore, the fact that the estimates concerned the future also precluded their enforcement by promissary estoppel.

*5. Agricultural Fair Practices Act Claim*

The Adkins further contend that Cagle JV violated the AFPA by interfering with their attempt to organize and participate in a growers' association and discriminating against them for such participation. Cagle JV concedes that if it engaged in such behavior, it would be in violation of the AFPA. See 7 U.S.C. §§ 2301-2305.

The Adkins, however, produced no evidence that any employee of Cagle JV ever harassed them regarding their efforts to organize and participate in a growers' association. Though Cagle JV representatives sometimes attended growers' association meetings, those meetings were public and the representatives never attempted to interfere in the organization's affairs. Nor did the Adkins put forth significant evidence of discrimination. They presented a statistical regression analysis (which the district judge gave little attention and which cannot establish a causal link) and isolated comments by Cagle JV representatives which do not appear to be connected to the growers' association issue. As noted supra, there is

no evidence of any systematic attempt to provide the Adkins with inferior birds or feed, to use improper weighing procedures, or to force the Adkins to sign the arbitration contract.

### 6. Breach of Contract Claim

The Adkins finally claim that Cagle JV breached its successive Brolier Production Agreements with them. They offer no new evidence or arguments to advance this claim, but rest on the same allegations of wrongdoing they cited in prior claims.

As Cagle JV specifically notes in its briefs to this court, nothing in the agreements required that the Adkins receive a specific number of flocks per year or birds per house. We have already concluded that Cagle JV did not intentionally misweigh birds, intentionally give the Adkins poor quality birds, intentionally provide the Adkins with inferior feed, or defraud the Adkins. The Adkins can point to no contractual provision which Cagle JV has breached.

We therefore affirm the district court's dismissal of the Adkins' claims against Cagle Foods JV.

### C.     The Adkins' Claims Against Cagle's, Inc. and Cagle's Farms, Inc.

The district court found that the Adkins' claims against Cagle's and Cagle's Farms were barred by the applicable statutes of limitations. For the fraud claim,

the applicable statute of limitations is four years. O.C.G.A. §§ 9-3-25, 9-3-26, 9-3-31. The Adkins' fraud claim against Cagle's and Cagle's Farms was based on projections made by Danny Eiland in 1992 and 1993, eight years before the Adkins filed the present complaint. See Denson v. Maloy, 239 Ga. App. 778, 779 (1999) (fraud statute of limitation runs from date injury occurs). The Adkins offer no argument in their briefs on appeal as to why the statute of limitations does not apply. Furthermore, their fraud claim is baseless. The income projections that Cagle's and Cagle's Farms originally provided the Adkins—and on which the Adkins base their claim—contained a disclaimer which made clear that they were "for illustrative purposes only and . . . not intended as a projection or forecast of actual performance." Even if the Adkins' claim were not barred by the statute of limitations, Georgia law is clear that "fraud cannot be predicated upon statements which are promissory in their nature as to future acts." Warner v. Jeter, 115 Ga. App. 6, 7 (1967).

The statute of limitations for the AFPA claim is two years. 7 U.S.C. § 2305(c). The Adkins' AFPA claim is based on a conversation between Doug Cagle and Lucius Adkins on December 30, 1998—three and a half years before the instant complaint was filed. The Adkins do not address this issue in their briefs or present any argument as to why the claim is not time-barred.

16

The district court was therefore correct in granting summary judgment for Cagle's and Cagle's Farms and dismissing the Adkins' claims against them.

D.    Cagle's, Inc. and Cagle's Farms, Inc.'s Motion for Sanctions

Cagle's Inc. and Cagle's Farms, Inc. have moved for sanctions under Rule 38 of the Federal Rules of Appellate Procedure.  They contend that this appeal was frivolous as to them.  Although we hold that the statute of limitations applied to bar the Adkins' claim against Cagle's and Cagle's Farms, the Adkins' appeal was not frivolous.  We therefore deny the motion for sanctions.

## III.

For the foregoing reasons, we AFFIRM the district court's grants of summary judgment for all the defendants and DENY Cagle's Inc. and Cagle's Farms, Inc.'s motions for sanctions.