**November 18, 2015**

# In the Court of Appeals of Georgia

A15A1167. RYMER et al. v. POLO GOLF AND COUNTRY CLUB
     HOMEOWNERS ASSOCIATION, INC.

MILLER, Judge.

John and Diane Rymer and the Diane L. Rymer Family Irrevocable Trust ("the Rymers") filed suit against Forsyth County ("the County") and the Polo Golf and Country Club Homeowners Association ("Polo"), asserting, inter alia, claims for nuisance, promissory estoppel and breach of legal duty, after the basement of their home in the Polo Fields subdivision flooded several times.[1] The trial court granted Polo's motion for summary judgment as to all of the Rymers' claims. The Rymers

---

[1] While this case was on appeal, the Rymers settled their claims against Forsyth County.

The Rymers also sought punitive damages and attorney fees in their suit against Polo. The trial court granted summary judgment to Polo on the Rymers' claim for punitive damages and reserved ruling on the Rymers' claim for attorney fees. The Rymers do not challenge these rulings on appeal and we do not address them here.

appeal, contending that the trial court erred in granting summary judgment to Polo because (1) Polo is estopped from denying that it has a duty to undertake repairs to the stormwater facilities, (2) Polo was obligated to either make repairs or force other residents to make repairs, and (3) Polo is liable for maintaining a nuisance.[2] For the reasons that follow, we agree that Polo is entitled to summary judgment as to the Rymers' claims for promissory estoppel, nuisance and breach of a legal duty arising under Polo's restrictive covenants and we affirm the trial court's order as to those claims. We, however, find that there are genuine issues of material fact as to whether Polo voluntarily undertook to make repairs to other homeowners' properties and, accordingly, we reverse the trial court's grant of summary judgment to Polo on the Rymers' claim for breach of legal duty based on a voluntary undertaking.

> Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. We apply a de novo standard of appellate review and view the

---

[2] This is the second appearance of this case on appeal. In *Polo Golf and Country Club Homeowners' Assoc. v. Rymer*, 294 Ga. 489, 495 (2) (754 SE2d 42) (2014), the Georgia Supreme Court held that a 2004 County ordinance requiring a homeowners association to maintain its subdivision's stormwater drainage facilities applied only to new developments and redevelopments and, therefore, did not apply to pre-existing developments, such as Polo.

2

evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Punctuation and footnote omitted.) *Community Marketplace Properties v. SunTrust Bank*, 303 Ga. App. 403, 404 (693 SE2d 602) (2010).

So viewed, the evidence shows that "Polo is a mandatory homeowners association at Polo Fields, a subdivision in Forsyth County consisting of approximately 1,000 lots. The subdivision was completed in the mid-1980's." *Polo Golf and Country Club Homeowners' Assoc. v. Rymer et al.*, 294 Ga. 489 (754 SE2d 42) (2014) ("*Rymer I*").

Polo Fields is governed by a Declaration of Covenants, Restrictions, and Easements, executed in 1986 ("the Covenants"). Under the Covenants, the developer and its successors and assignees have the right to create perpetual easements for any purpose, including stormwater drains. In 1991, the developer assigned its interest in Polo Fields to Fairgreen Capital. In *Rymer I*, the Supreme Court held that the Covenants "provide that each homeowner is to maintain and repair the structures on his own property, including any stormwater facilities or device affecting or altering the natural flow of surface waters on any lot." *Rymer I*, supra, 294 Ga. at 489. Polo does not own any stormwater facilities in the subdivision.

In 1998, the Rymers purchased a house at 5925 Polo Drive, Plat 11, in the Polo Fields subdivision ("the Property"). On the side yard of the Property, there is a 20-foot wide drainage easement that contains a 30-inch, metal underground pipe that drains stormwater from upstream properties. The typical life span of a metal pipe is 25 years and the pipe that runs underneath the Property and Polo Drive was installed more than 25 years ago.

The side yard of the Property is the lowest point for miles, and stormwater drains onto the Property from every direction. Surface water from approximately 12.5 acres of surrounding land, including residences, pastureland, and roads, drains into the pipe running underneath the Property. From the Property, the pipe proceeds underneath Polo Drive and underneath the side yard of 5920 Polo Drive, which is across the street from and downstream of the Property. Underneath the side yard of 5920 Polo Drive, there is a junction box that connects the 30-inch pipe to a 24-inch pipe that runs underneath several residential lots and drains into Wellington Lake. Surface water from Polo Drive also drains from catch basins into the 30-inch pipe.

The basement of the Property flooded in 2003. In the fall of 2004, John Rymer first contacted Polo about the flooding. After the Property flooded again in 2005, the Rymers contacted Polo again and asked it to address the drainage problems. In 2006,

Polo notified the Rymers that it took the position that the County, rather than Polo or any individual homeowner, should be responsible for maintenance of the stormwater facilities. In 2007, however, Polo commissioned an engineer to study the stormwater drainage facilities within Polo Fields and make recommendations for repairs. Polo then collected funds from homeowners to make repairs.

In July 2009, Polo notified the Rymers that it had identified the Property as needing minor repair work, which Polo offered to undertake as part of its efforts to address the drainage issues, provided that the Rymers agreed to release Polo from liability. Although the Rymers provided a release, these repairs were never made. The Rymers' basement flooded again in September 2009. In February 2010, the Rymers filed their initial complaint in this suit.

The Rymers basement flooded again on July 16 and 17, 2010. On July 17, 2010, the pipe that runs from the Property underneath Polo Drive collapsed in the yard of 5920 Polo Drive and a large sinkhole developed. Thereafter, the owner of 5920 Polo Drive repaired the collapsed pipe on her property and the County replaced the portion of pipe underneath the shoulder of Polo Drive. No flooding has occurred on the Property since July 17, 2010.

1. The Rymers contend that the trial court erred in granting summary judgment to Polo because, under the law of the case, Polo is estopped from denying that it assumed a duty to make repairs to the Property and there was some evidence that the Rymers relied on Polo's promises to make repairs. We disagree.

(a) With regard to the posture of this case, we note that after the Rymers filed their initial complaint, Polo counter-claimed against the Rymers for violation of the Covenants on the ground that the Rymers failed to maintain and repair the stormwater facilities on the Property. In *Rymer I*, the Supreme Court of Georgia affirmed the denial of summary judgment to Polo on its counterclaim seeking to compel the Rymers to make repairs. See *Rymer I*, supra, 294 Ga. at 492 (1).

Although the law of the case has generally been abolished in Georgia, "any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be." OCGA § 9-11-60 (h). If, however, "subsequent to an appellate decision, the evidentiary posture of the case changes in the trial court, the law of the case rule does not limit or negate the effect that such change would otherwise mandate." (Citation omitted.) *Brown v. Piggly Wiggly Southern, Inc.*, 228 Ga. App. 629 (1) (493 SE2d 196) (1997). The posture of the case

6

can be changed by an amendment to the complaint or by the submission of additional evidence. See id.; *May v. Macioce*, 200 Ga. App. 542, 544 (2) (409 SE2d 45) (1991).

In concluding that the trial court properly denied Polo's motion for summary judgment on its counterclaim against the Rymers, the Supreme Court of Georgia found that:

> [w]hen the Rymers brought their flooding problems to the attention of Polo, it took the position that neither the Rymers nor Polo was responsible for the management and upkeep of the stormwater facilities. Instead, Polo asserted responsibility rested with the [C]ounty. Moreover, Polo notified the Rymers that it was commissioning a study of the stormwater facilities in the subdivision seeking recommendations for repairs and it assured the Rymers that it would make repairs to the stormwater facilities at its own expense. John Rymer averred that he relied on Polo's promises to make the necessary repairs, that the repairs were never made, and that the Rymers experienced additional flooding. Under these facts, a jury could find that the Rymers reasonably relied upon Polo's promise.

(Citation omitted.) *Rymer I*, supra, 294 Ga. at 492 (1).

The Supreme Court's ruling concerned the Rymers' promissory estoppel defense to Polo's counterclaim against the Rymers for their failure to make repairs pursuant to the Covenants. See *Rymer I*, supra, 294 Ga. at 491 (1). Upon remand,

7

Polo dismissed its counterclaim against the Rymers and the Rymers filed an amended complaint, asserting a new claim against Polo for promissory estoppel based on Polo's promise to make repairs to the Property. New evidence, namely, the Rymers' 2014 depositions, was also submitted after remand. Since the posture of the case changed in the trial court, both because the Rymers added a new, distinct claim and because new evidence was submitted, the law of the case is inapplicable and the Supreme Court's prior ruling is no longer binding. See *Brown*, supra, 228 Ga. App. at 629 (1).

(b) As to the merits of the Rymers' claim, to prevail on a claim of promissory estoppel, the Rymers are required to show that (1) Polo made certain promises; (2) Polo should have expected the Rymers to rely on those promises; (3) the Rymers did in fact rely on those promises to their detriment; and (4) injustice could be avoided only by enforcement of the promises. See *First Bank of Ga. v. Robertson Grading, Inc.*, 328 Ga. App. 236, 241-242 (1) (761 SE2d 628) (2014).

In July 2009, Polo notified the Rymers that it had identified the Property as needing minor repair work, which Polo offered to undertake after the Rymers signed a release giving the contractor permission to make repairs on the Property. Polo, however, never made any repairs to the Property. The trial court found that there was

8

no evidence that the Rymers detrimentally relied on Polo's assurances because they failed to provide Polo with access to the Property to make repairs. John Rymer, however, deposed that he signed a release. As Polo concedes, John Rymer's statement creates a question of fact as to whether the Rymers executed a release to provide Polo with access to the Property.

Even if there is a question of fact as to the release, we may nevertheless affirm the trial court's grant of summary judgment if it is right for any reason, whether stated or unstated, so long as the legal basis was fairly presented in the court below. See *Georgia-Pacific, LLC v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013). As Polo argued in its motion for summary judgment, the Rymers' 2014 deposition testimony shows that they did not detrimentally rely on Polo's representations that it would make repairs to the Property.

In 2011, John Rymer averred that he and his wife relied on Polo's representations that Polo was taking care of the stormwater drainage problems. During his 2014 deposition, however, John Rymer said that there were no repairs that could be made to the Property that would prevent flooding and that making minor repairs with hand tools to the Property, as Polo had offered to do, would not have

9

fixed the flooding. Diane Rymer deposed that any repairs to the Property would not have fixed the flooding.

Under the rule set forth in *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986), a party's unexplained self-contradictory testimony must be construed against him for purposes of summary judgment. See *Thompson v. Ezor*, 272 Ga. 849, 851 (1) (536 SE2d 749) (2000). Since the Rymers' 2014 deposition testimony contradicts John Rymer's 2011 averment, we must construe this evidence against the Rymers to mean that they do not believe that there are repairs that could be done on the Property that would fix the flooding problem and, thus, they could not have relied to their detriment on Polo's promise to make repairs to the Property. See *Prophecy Corp.*, supra, 256 Ga. at 30 (2). Accordingly, Polo is entitled to summary judgment on the Rymers' promissory estoppel claim, and we affirm the trial court's grant of summary judgment as to that claim.

2. The Rymers contend that the trial court erred in granting summary judgment to Polo as to their claim for breach of legal duty because Polo was required to enforce maintenance obligations on individual property owners and undertook its own obligation to make repairs itself. For the reasons that follow, we agree in part.

(a) The Covenants.

Although the Rymers have abandoned their earlier claim that the Covenants impose an affirmative duty on Polo to maintain the drainage easements and stormwater facilities itself, they contend on appeal that the Covenants require Polo to force other homeowners to undertake necessary repairs. We disagree.

> Restrictive covenants on real estate run with the title to the land and are specialized contracts that inure to the benefit of all property owners affected. The construction, interpretation and legal effect of such a contract is an issue of law to which the appellate court applies the plain legal error standard of review. In construing a restrictive covenant, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning.

(Citations omitted.) *Crouch v. Bent Tree Community*, 310 Ga. App. 319, 320 (1) (713 SE2d 402) (2011).

The Covenants establish an Architectural Control Committee (the "ACC") with "the power and duty to approve or disapprove plans and specifications for any installation, construction or alteration of any [s]tructure on any [l]ot." The ACC is also tasked with adopting design standards, both governing the form, content, and procedure for the submission of plans and specifications and "establishing guidelines with respect to the approval or disapproval of design features, architectural styles,

11

exterior color and materials, details of construction, location and size of [s]tructures and all other matters that require" ACC approval , as well as "assuring the conformity and harmony of external design and general quality of" Polo Fields. The Covenants give Polo and the ACC the right to enter any lot or structure, after giving reasonable notice, to inspect it in order to determine whether it is being maintained in compliance with the Covenants. The ACC may impose and collect fees to cover the cost of inspections.

As set forth above, sections 1.12 and 6.14 of the Covenants "provide that each homeowner is to maintain and repair the structures on his own property, including any stormwater facilities or device affecting or altering the natural flow of surface waters on any lot." *Rymer I*, supra, 294 Ga. at 489. Section 6.14 of the Covenants — the maintenance provision — further provides that:

> *If in the opinion of the ACC, any Owner shall fail to perform the duties imposed by this Section, the ACC shall notify [Polo]. If the Board shall agree with the determination of the ACC* with respect to the failure of said Owner to perform the duties imposed by this Section, then [the] Board shall give written notice to the Owner to remedy the condition in question . . . . *If the Owner shall fail to take reasonable steps to remedy the condition within [30] days . . ., then [Polo] shall have the Right of Abatement* as provided in Section 8.02[.]

12

(Emphasis supplied.) The ACC and the Board are similarly empowered to request owners to take remedial action if any structure that is not in accordance with the plans and specifications approved by the ACC is placed or maintained on a homeowner's property.

The Covenants set forth various enforcement methods, including the right of enforcement and the right of abatement. Section 8.01 states that the Covenants are enforceable (1) by the declarant as long as it is an owner, (2) by each owner, and (3) by the holder of any deed to secure debt upon any lot. As set forth above, the declarant assigned its interest in Polo Fields to Fairgreen Capital. Accordingly, Polo is neither a declarant, a property owner, not a holder of any deed to secure debt.

Pursuant to section 8.02, "in the event of a violation or breach" of the Covenants, Polo "shall give written notice" to the owner setting forth the violation and required remedial actions. If the owner fails to take reasonable steps to remedy the violation, then Polo has the right of abatement. The right of abatement is defined as Polo's right to "enter at all reasonable times" a lot or structure that is in violation of the Covenants and take the remedial actions specified in the notice previously sent to the homeowner. Pursuant to the right of abatement, if Polo takes remedial action, it is not deemed to have committed a trespass and may file suit to collect the costs of

13

the remedial action, as well as the costs of collection, reasonable attorney fees and interest.

The Covenants do not limit the rights of the declarant, Polo, or any homeowner to file suit seeking money damages or an injunction in an effort to enforce the Covenants. Polo also has the power to impose reasonable monetary fines on homeowners for violations of the Covenants. If any cost is not paid as required under the Covenants, Polo may enforce a lien or bring suit.

The Rymers argue that because Polo has the right to abate violations of the Covenants, it had an obligation to force homeowners to make repairs to the stormwater drainage facilities within Polo Fields, or make the necessary repairs itself. The Covenants, however, do not impose on Polo a mandatory duty to abate. Rather, the Covenants permit Polo the right to abate. See *Rymer I*, supra, 294 Ga. at 489 ("If the covenants are violated by a homeowner, Polo *can* pursue these remedies: file suit against the homeowner; levy fines against the homeowner; [or] enter the homeowner's lot to make necessary repairs at the homeowner's expense.") (emphasis supplied).

Pursuant to the Covenants, Polo can exercise its right to abatement only after it has determined that a homeowner is in violation of the Covenants' maintenance

14

provision, notified the homeowner of the violation at issue and asked the homeowner to remedy the violation. "No principle of law is more firmly fixed in our jurisprudence than the one which declares that the courts will not interfere in matters involving merely the judgment of the majority in exercising control over corporate affairs." (Citation and punctuation omitted.) *Vernon Bowdish Builder, Inc. v. Spalding Lake Homeowners Assn.*, 196 Ga. App. 370 (396 SE2d 24) (1990). Moreover, the Covenants vest the decision as to whether homeowners are in violation of the maintenance provision of the Covenants with Polo. Accordingly, this Court cannot substitute its judgment for that of Polo. See *King v. Baker*, 214 Ga. App. 229, 235 (5) (447 SE2d 129) (1994) (where restrictive covenants gave neighborhood committee discretion to determine whether the number of animals on a particular property is reasonable, trial court cannot substitute its own judgment).

The essence of the Rymers' complaint is that Polo should have exercised its right of abatement by forcing other homeowners to make repairs to the stormwater drainage facilities. Thus, the controversy turns on a difference in judgment between the Rymers and Polo and does not create a cause of action in favor of the Rymers. See *Vernon Bowdish Builder*, supra, 196 Ga. App. at 370 (controversy between homeowner and homeowners' association over whether association had done enough

15

to maintain common area was not actionable). Accordingly, the trial court did not err in granting summary judgment to Polo on the Rymers' claim that Polo violated its duty, under the Covenants, to force other homeowners to undertake necessary repairs.

(b) Voluntary Undertaking.

The Rymers also argue that, aside from the Covenants, Polo breached a legal duty to make repairs when it announced that it was going to repair the drainage facilities and then did not do so. We agree.

Under well-established Georgia law, a person may be held liable for the negligent performance of a voluntary undertaking. See *Osowski v. Smith*, 262 Ga. App. 538, 540 (1) (586 SE2d 71) (2003).

> Under this principle, one who undertakes to do an act or perform a service for another has the duty to exercise care, and is liable for injury resulting from his failure to do so, even though his undertaking is purely voluntary or even though it was completely gratuitous, and he was not under any obligation to do such act or perform such service, or there was no consideration for the promise or undertaking sufficient to support an action ex contractu based thereon. When one undertakes an act that he has no duty to perform and another person reasonably relies upon that undertaking, the act must generally be performed with ordinary or reasonable care.

(Citations omitted.) Id.; see also Restatement (Second) of Torts § 323 (1965).

16

Contrary to the Rymers' argument, Polo did not undertake a legal duty to repair the drainage facilities in its 2006 letter to the Rymers since Polo disavowed any responsibility for repairs in that letter. Nevertheless, there is evidence that in 2004, a homeowner whose lot was downstream of the Rymers' lot developed sinkholes on his property. Some time later, Polo indicated that it would replace pipes on the homeowner's property, and although that homeowner consented to allow Polo to inspect his property, it made no repairs. Additionally, in 2007, Polo commissioned a study of the stormwater drainage facilities and began collecting funds to make repairs to these facilities within Polo Fields.

Moreover, in the 2009 letter to the Rymers, discussed above in Division (1) (b), Polo not only promised to make repairs to the Property, it also indicated that it had "worked extensively to evaluate and address [stormwater drainage] issues affecting our neighborhood." Polo also wrote that it was finalizing the selection of a contractor, and would "soon be ready to move forward with a number of repairs." As set forth above, John Rymer averred that he and his wife relied on these representations and, unlike Polo's promise to repair the Property, there is no record evidence that the Rymers did not rely on Polo's promise to make repairs to other properties in Polo Fields. Thus, the evidence is sufficient to raise a genuine issue of material fact as to

17

whether Polo promised and voluntarily undertook to make repairs to other Polo Fields homeowners' properties by commissioning a study, collecting funds, identifying properties, selecting a contractor, and obtaining the homeowners' consent for inspection. Accordingly, we reverse the trial court's grant of summary judgment to Polo on the Rymers' claim for breach of legal duty based on a voluntary undertaking.

3. The Rymers contend that the trial court erred in granting summary judgment to Polo on their nuisance claim because Polo was obligated to repair the stormwater facilities. We disagree.

"The essential element of nuisance is control over the cause of the harm. The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." (Citation and punctuation omitted.) *Grinold v. Farist*, 284 Ga. App. 120, 122 (2) (643 SE2d 253) (2007). Here, although there is a genuine issue of material fact as to whether Polo promised to make repairs to the stormwater drainage facilities within Polo Fields, there is no evidence that Polo actually made any repairs to those facilities. Nor is Polo obligated, under the Covenants, to make such repairs, since the evidence clearly shows that Polo does not own or control any drainage facilities within Polo Fields. Accordingly, there is no evidence that Polo exercised control over the alleged cause of the harm and the trial

18

court did not err in granting summary judgment to Polo on the Rymers' nuisance claim. See *Futch v. Lowndes County*, 297 Ga. App. 308, 313 (5) (676 SE2d 892) (2009) (holding that defendant was entitled to summary judgment where it exercised no control over any nuisance-creating instrumentality).

Thus, we affirm the trial court's grant of summary judgment to Polo on the Rymers' promissory estoppel claim; we affirm the trial court's grant of summary judgment to Polo on the Rymers' claim for breach of legal duty based on the Covenants; we reverse the trial court's grant of summary judgment to Polo on the Rymers' claim for breach of legal duty based on a voluntary undertaking; and we affirm the trial court's grant of summary judgment to Polo on the Rymers' nuisance claim.

*Judgement affirmed in part and reversed in part. Andrews, P. J., and Branch, J., concur.*